**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| **YOLANDA M. JOHNSON and** | § | **Case No.: 4:25-cv-00172** |
| **JOEL JOHNSON,** | § | |
| | § | **COMPLAINT** |
| *Plaintiffs*, | § | |
| **v.** | § | **JURY TRIAL DEMANDED** |
| | § | |
| **MONSANTO COMPANY,** | § | |
| | § | |
| *Defendant.* | § | |

Plaintiffs Yolanda M. Johnson and Joel Johnson ("Plaintiffs"), by and through the undersigned counsel, bring this Complaint for damages against Defendant Monsanto Company ("Defendant" or "Monsanto"), and alleges the following:

<u>PARTIES</u>

1.      Plaintiff Yolanda M. Johnson is over the age of eighteen and is a resident and citizen of Port St. Lucie, Florida.

2.      Plaintiff Joel Johnson is over the age of eighteen and is a resident and citizen of Port St. Lucie, Florida

3.      Defendant Monsanto is incorporated in the State of Delaware, with a principal place of business in St. Louis, Missouri.

4.      Plaintiffs bring this action for injuries he sustained by exposure to Roundup® containing the active ingredient glyphosate and the surfactant polyoxyethylene tallow amine (POEA). As a direct and proximate result of being exposed to Roundup® ("Roundup"), Plaintiff Yolanda Johnson developed diffuse large B-cell lymphoma ("DLBCL"), a subtype of Non-Hodgkins Lymphoma ("NHL").

5.      "Roundup" refers to all formulations of Defendant's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak Herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass, and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup

Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer 1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, Roundup Weed & Grass Killer III, or any other formulation of containing the active ingredient glyphosate.

## <u>VENUE AND JURISDICTION</u>

6.      This Court has jurisdiction over Defendant and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendant. Defendant is incorporated in and maintains its principal place of business outside the state in which the Plaintiffs reside.

7.      The amount in controversy exceeds $75,000, exclusive of interest and cost.

8.      The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

9.      Venue is proper within this district pursuant to 28 U.S.C. § 1391(d) in that Defendant conducts substantial business here and is subject to personal jurisdiction in this district. Furthermore, Defendant sells, markets, and/or distributes Roundup within the Northern District of Florida.

10.      Defendant advertises and sells goods, specifically Roundup, throughout the United States, including in Florida.

11.      Defendant transacted and conducted business within the State of Florida that relates to the allegations in this Complaint.

12.      Defendant derived substantial revenue from goods and products used in the State of Florida.

13.    Defendant expected or should have expected its acts to have consequences within the State of Florida, and derived substantial revenue from interstate commerce.

14.    Defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

15.    Defendant is authorized to do business in the State of Florida and derives substantial income from doing business in this state.

16.    Defendant purposefully availed itself of the privilege of conducting activities with the State of Florida, thus invoking the benefits and protections of its laws.

17.    Defendant designed, sold, advertised, manufactured and/or distributed Roundup, with full knowledge of its dangerous and defective nature.

## NATURE OF THE CASE

18.    This is an action for damages suffered by Plaintiffs as a direct and proximate result of Defendant's negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup, containing the active ingredient glyphosate.

19.    Plaintiffs maintain that Roundup and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce and lacks proper warnings and directions as to the dangers associated with its use.

20.    Plaintiffs' injuries, like those striking thousands of similarly situated victims across the country, were avoidable.

## FACTUAL ALLEGATIONS

21.    At all relevant times, Defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell and distribute the commercial herbicide Roundup.

22.    Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

23.     Defendant discovered the herbicidal properties of glyphosate during the 1970s and subsequently began to design, research, manufacture, sell and distribute glyphosate-based Roundup as a broad-spectrum herbicide.

24.     Glyphosate is the active ingredient in Roundup.

25.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

26.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

27.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

28.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

29.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses.

30.     For nearly 40 years, consumers, farmers, and the general public, including Plaintiffs, have used Roundup, unaware of its carcinogenic properties.

**REGISTRATION OF HERBICIDES UNDER FEDERAL LAW**

31.     The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. § 136 *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. § 136a(a).

32.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in

registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

33.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, considering the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

34.    The EPA registered Roundup for distribution, sale, and manufacture in the United States.

35.    FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

36.    The evaluation of each pesticide product distributed, sold, or manufactured is completed when the product is first registered. The data necessary for pesticide registration has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally mandated process called "re-registration." 7 U.S.C. § 136a-1. To re-evaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

37.    In the case of glyphosate and Roundup, the EPA had planned to release its preliminary risk assessment—in relation to the registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015 but delayed releasing the assessment pending further review, in light of the World Health Organization (WHO)'s findings.

## MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP

38.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to

mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

"a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences...

b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c) Roundup -- biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f) You can apply Accord with confidence because it will stay where you put it… it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) 'Roundup can be used where kids and pets will play and breaks down into natural material.' This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup."[1]

39.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) "its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk…"

***

---

[1] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

    b) "its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable…"

***

    c) "its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means…"

***

    d) "its glyphosate-containing pesticide products or any component thereof are 'good' for the environment or are 'known for their environmental characteristics'…"

***

    e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

***

    f) "its glyphosate-containing products or any component thereof might be classified as 'practically non-toxic.'"[2]

40.    Monsanto did not alter its advertising in the same manner in any state other than New York, and, on information and belief, still has not done so today.

41.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

<u>EVIDENCE OF CARCINOGENICITY IN ROUNDUP</u>

42.    As early as the 1980s, Monsanto was aware of glyphosate's carcinogenic properties.

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).
[3] *Monsanto Guilty in 'False Ad' Row,* BBC, Oct. 15, 2009, available at http://news.bbc.co.uk/2/hi/europe/8308903.stm.

43.     On March 4, 1985, a group of EPA's Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

44.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214) ("Registration Standard").[5] The Registration Standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies.

45.     In October 1991, the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

46.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant's Roundup products are more dangerous and toxic than glyphosate alone.[7] As early as 1991, evidence existed establishing that glyphosate formulations were significantly more toxic than glyphosate alone.[8]

---

[4] United States Environmental Protection Agency: Office of Pesticides and Toxic Substances. Memorandum: Consensus Review of Glyphosate, Casewell No. 661A (March 4, 1985). Available at https://archive.epa.gov/pesticides/chemicalsearch/chemical/foia/web/pdf/103601/103601-171.pdf.

[5] United States Environmental Protection Agency: Office of Pesticides and Toxic Substances. Guidance for the Reregistration of Pesticide Products Containing Glyphosate as the Active Ingredient, Case Number 0178.    Washington:    Government    Printing    Office,    1986.    Available    at https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=9100AGUQ.PDF.

[6] United States Environmental Protection Agency: Office of Pesticides and Toxic Substances. Second Peer Review    of    Glyphosate,    CAS    No.    1071-83-6    (October    30,    1981).    Available    at https://www3.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_13-Dec-91_268.pdf, at 3.

[7] Martinez, A., *et al.* (2007). "[Cytotoxicity of the herbicide glyphosate in human peripheral blood mononuclear cells]." Biomedica 27(4): 594-604; Benachour, N. and G.-E. Seralini (2009). "Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells." Chem Res Toxicol. 22(1): 97-105; Gasnier, C., *et al.* (2009). "Glyphosate-based herbicides are toxic and endocrine disruptors in human cell lines." Toxicology 262(3): 184-191; Peixoto, F. (2005). "Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation," Chemosphere 61(8): 1115-1122; Marc, J., *et al.* (2004). "Glyphosate-based pesticides affect cell cycle regulation." Biol. Cell 96(3): 245-249.

[8] Martinez, T.T., *et al.* (1991) "Oral and pulmonary toxicology of the surfactant used in roundup herbicide." Proc. West Pharmacol. Soc. 1991; 34:43-6.

47.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."[9]

48.     The study found that Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

49.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study showed a molecular link between glyphosate-based products and cell cycle dysregulation.[10]

50.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer" and "[f]ailure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell."[11] Further, it noted "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[12]

51.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.[13]

52.     The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could result from other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

53.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.[14]

---

[9] Marc J., *et al.* (2002). "Pesticide Roundup provokes cell division dysfunction at the level of CDK1/cyclin B activation." Chem Res Toxicol. 15(3):326-31.

[10] Marc, J., *et al.* (2004). "Glyphosate-based pesticides affect cell cycle regulation." Biol. Cell 96(3): 245-249.

[11] Marc, J., *et al.* (2004).

[12] Marc, J., *et al.* (2004). *See also* Molinari, 2000; Stewart *et al.*, 2003.

[13] Peixoto, F. (2005). "Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation," Chemosphere 61(8): 1115-1122.

[14] Benachour, N. and G.-E. Seralini (2009). "Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells." Chem Res Toxicol. 22(1): 97-105.

54.     The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify the toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should consider the presence of adjuvants[15], or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert, and that Roundup is always more toxic than its active ingredient glyphosate.

55.     The results of these studies were confirmed in recently published peer-reviewed studies and were, at all times, available and/or known to Defendant.

56.     Defendant knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup.

57.     Defendant knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

58.     Defendant !!! failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiffs from Roundup.

59.     Rather than performing appropriate tests, Defendant relied on flawed industry-supported studies designed to protect Defendant's economic interests, endangering Plaintiffs and the consuming public.

60.     Despite possessing knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendant continued to promote it as safe.

**IARC CLASSIFICATION OF GLYPHOSATE**

61.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the WHO tasked with conducting and coordinating research into the causes of cancer.

---

[15] "Adjuvant" is defined in Merriam Webster's Online Dictionary as "serving to aid or contribute: auxiliary." "Adjuvant" is also defined in Merriam Webster's Dictionary as, "one that helps or facilitates: such as a: an ingredient (as in a prescription or a solution) that modifies the action of the principal ingredient." *Merriam-Webster.com*. 2022. https://www.merriam-webster.com (July 30, 2022).

62.    The IARC Monographs on the Identification of Carcinogenic Hazards to Humans identify environmental factors that can increase the risk of human cancer. Interdisciplinary Working Groups of expert scientists review the published studies and evaluate the weight of the evidence in identifying carcinogenic hazards.

63.    An IARC Advisory Group in 2014, determined which substances were priorities for IARC to review and identify for the final determination which would be published in the IARC Monograph in 2015. For a substance to be chosen for review by the IARC Working Groups, it must meet two of the threshold criteria: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

64.    IARC reviewed glyphosate in 2015-2016. IARC chooses chemicals with the following qualities for priority consideration: (1) the substance must have a potential for direct impact on public health; (2) scientific literature must support suspicion of carcinogenicity; (3) there must be evidence of significant human exposure; (4) there must be a high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern.

65.    The IARC working group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available" in making their determinations.[16]

66.    On March 24, 2015, after more than a year of cumulative review of human, animal, and DNA studies (many of which have been in Defendant's possession since as early as 1985), the IARC's working group published its conclusion -- the glyphosate contained in Defendant's Roundup herbicide is a Class 2A "probable carcinogen."[17] The working group concluded that the glyphosate's probable carcinogenetic properties were demonstrated in the mechanistic evidence of carcinogenicity in humans. The working group also determined that there was sufficient evidence of carcinogenicity in animals.

---

[16] See the summary on the Monograph 112. Available at https://www.iarc.who.int/wp-content/uploads/2018/07/MonographVolume112-1.pdf.

[17] See IARC Biennial Report, 2014-2015, at p. 17-18, citing Working Group Report, Volume 112: Tetrachlorvinphos, Parathion, Malathion, Diazinon, and Glyphosate (3–10 March 2015). Available at https://publications.iarc.fr/Book-And-Report-Series/Iarc-Biennial-Reports/IARC-Biennial-Report-2014-2015.

67.    The IARC Working Group published a Monograph Report on July 29, 2015, establishing glyphosate as a class 2A probable carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.[18]

68.    The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

69.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

70.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphonic acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

71.    The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

72.    The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

### EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

73.    Despite the new classification by the IARC, Defendant has had ample evidence of glyphosate and Roundup's genotoxic properties for decades prior to the IARC's work.

---

[18] IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Some Organophosphate Insecticides and Herbicides, Volume 112 (July 29, 2015). Available at https://publications.iarc.fr/549.

74.    In 1997, Chris Clements published, "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."[19] Genotoxicity refers to chemical agents that can damage the DNA within a cell through genetic mutations — a process that is believed to lead to cancer. Clements's study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

75.    Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.[20] Oxidative stress and associated chronic inflammation are believed to contribute to carcinogenesis.

76.    The IARC Working Group noted that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."[21] In the final Monograph report, it also set forth the sheer volume of evidence of glyphosate pesticides' genotoxicity, noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong." [22]

77.    Defendant has long been aware of glyphosate's carcinogenic properties. Glyphosate and Roundup have long been linked to carcinogenicity and the development of many forms of cancer, including, but not limited to, NHL, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma. Defendant has known of this association since the early to mid-1980s and

---

[19] Clements, C., *et al.* (1997). "Genotoxicity of Select Herbicides in Rana catesbeiana Tadpoles Using the Alkaline Single-Cell Gel DNA Electrophoresis (Comet) Assay." Environmental and Molecular Mutagenesis 29:277–288.
Available at http://www.ask-force.org/web/HerbizideTol/Clements-Genotoxicity-Select-Herbicides-Todpoles-1997.pdf.
[20] Paz-y-Miño, C., *et al.* (2007). Evaluation of DNA damage in an Ecuadorian population exposed to glyphosate. Genet Mol Biol, 30(2):456–60. (The study produced evidence of chromosomal damage in blood cells after exposure to glyphosate, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.) (available at https://www.scielo.br/j/gmb/a/CcSQKvdsZWqcXjBZ5HjvT3C/?lang=en); *see also* United States Environmental Protection Agency: Office of Pesticides and Toxic Substances. Memorandum: Use of historical data in determining the weight of evidence from kidney tumor incidence in the Glyphosate two-year feeding study and some remarks on false positives. Washington (February 26, 1985) (available at https://www3.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_26-Feb-85_170.pdf).
[21] IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Some Organophosphate Insecticides and Herbicides, Volume 112 (July 29, 2015). Available at https://publications.iarc.fr/549.
[22] IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Some Organophosphate Insecticides and Herbicides, Volume 112 (July 29, 2015). Available at https://publications.iarc.fr/549.

numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.[23,24]

78.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.[25] The 2003 study published by A.J. De Roos examined the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL. This study, too, found a relationship between glyphosate and an increased incidence of NHL.[26]

79.     In 2008, Mikael Eriksson published a population-based case-control study of exposure to various pesticides as a risk factor for NHL.[27] The Eriksson study looked at men and women aged 18 – 70 years old living in Sweden. The study's conclusion, "confirmed our study confirmed an association between exposure to phenoxyacetic acids and NHL and the association

---

[23] United States Environmental Protection Agency: Office of Pesticides and Toxic Substances. Memorandum: Use of historical data in determining the weight of evidence from kidney tumor incidence in the Glyphosate two-year feeding study and some remarks on false positives. Washington (February 26, 1985). Available at https://www3.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_26-Feb-85_170.pdf. (The EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.)

[24] Hardell, L, *et al.* (2002) "Exposure to pesticides as risk factor for non-Hodgkin's lymphoma and hairy cell leukemia: pooled analysis of two Swedish case-control studies." Leuk Lymphoma. May;43(5):1043-9. Available at https://pubmed.ncbi.nlm.nih.gov/12148884/. (Lennart Hardell and Mikael Eriksson published the results of two case-controlled studies on pesticides as a risk factor for NHL. The study concluded that glyphosate had the most significant relationship to NHL among all herbicide studies with an increased odds ratio of 3.11.)

[25] IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Some Organophosphate Insecticides and Herbicides, Volume 112 (July 29, 2015). Available at https://publications.iarc.fr/549.

[26] De Roos, A.J., *et al.* (2003). "Integrative assessment of multiple pesticides as risk factors for non-Hodgkin's lymphoma among men." Occupational and Environmental Medicine 2003;60:e11. Available at https://oem.bmj.com/content/oemed/60/9/e11.full.pdf.

[27] Eriksson, M., *et al.* (2008). "Pesticide exposure as risk factor for non-Hodgkin lymphoma including histopathological subgroup analysis." Int. J. Cancer, 123: 1657-1663. Available at: https://doi.org/10.1002/ijc.23589.

with glyphosate was considerably strengthened."[28] The 2003 De Roos study and the 2008 Mikael Eriksson study strengthened previous associations between glyphosate and NHL.

80.    Despite knowing of all these studies and scientific conclusions, Defendant continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, extensive evidence to the contrary.

81.    Upon information and belief, these statements, and Defendant made these representations with the intent of inducing Plaintiffs and the public at large to purchase, and increase the use of, Roundup for Defendant's pecuniary gain, and, in fact, did induce Plaintiffs to use Roundup. Defendant made these statements with complete disregard and reckless indifference to the safety of Plaintiffs and the general public.

82.    Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, multiple myeloma, and soft tissue sarcoma.

83.    Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, multiple myeloma, and soft tissue sarcomas.[29]

84.    Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

85.    Defendant's statements proclaiming the safety of Roundup and disregarding its dangers misled Plaintiffs. Defendant's failure to adequately warn Plaintiffs resulted in (a) Plaintiffs using and being exposed to glyphosate instead of using another acceptable and safe method of

---

[28] Eriksson, M., *et al.* (2008). "Pesticide exposure as risk factor for non-Hodgkin lymphoma including histopathological subgroup analysis." Int. J. Cancer, 123: 1657-1663. Available at: https://doi.org/10.1002/ijc.23589.
[29] Many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

controlling unwanted weeds and pests; and (b) the scientific and medical communities failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

86.    Defendant failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure. The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers. Defendant's failure to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and has resulted in the directions for use that are not adequate to protect health and the environment.

87.    Defendant failed to appropriately and adequately inform and warn Plaintiffs of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

88.    By reason of the foregoing acts and omissions, Plaintiffs seek compensatory damages as a result of Plaintiff Yolanda Johnson's use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Plaintiff to suffer from NHL. Further, Plaintiff suffered severe, permanent injuries, physical pain, and incurred significant medical expenses. Plaintiff has endured and continues to suffer, emotional and mental anguish, including her diminished enjoyment of life, and suffered other economic and non-economic damages.

### PLAINTIFF YOLANDA JOHNSON'S EXPOSURE TO ROUNDUP

89.    Plaintiff Yolanda Johnson used or was directly exposed to Roundup on a regular basis for at least 15 years at her residence in Port St. Lucie, Florida. She used Roundup in her immediate vicinity approximately once a week during the spring, summer, and fall, and approximately once a month during the winter. She sprayed it around her fence, her house, and the

concrete areas on her property. The lot where her house was located was approximately one-quarter of an acre in size.

90.     Plaintiff was subsequently diagnosed with DLBCL, a subtype of NHL, on or about April 19, 2023, at the age of forty-nine (49).

91.     Upon information and belief, Plaintiff developed NHL as a result of her exposure to Roundup.

92.     Plaintiffs filed the instant action within the applicable statute of limitations, in light of Defendant's deceptive and fraudulent representations over the course of decades and considering the information available to them at the time of Yolanda's diagnosis.

## FIRST CAUSE OF ACTION
### (NEGLIGENCE)

93.     Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

94.     Defendant had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to ensure that the product would not cause users to suffer unreasonable, dangerous side effects.

95.     Defendant failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and distribution of Roundup into interstate commerce. Defendant knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

96.     The negligence by Defendant, its agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a)  Negligently designing, manufacturing, producing and formulating Roundup in a manner, which was dangerous to its users;

b)  Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

c)  Failing to adequately, sufficiently, and properly test Roundup and by not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties, including the toxicity of Roundup's parent compound, after Defendant had knowledge that Roundup was or could be carcinogenic;

c)  Negligently failing to adequately and correctly warn Plaintiffs, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup and by negligently failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

d)  Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge to ensure its safe use or at least warn of its dangerous propensities;

e)  Negligently representing that Roundup was safe for use for its intended purpose, and that it was safer than ordinary and common items such as table salt, when, in fact, it was unsafe and by negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

f)  Negligently failing to petition the EPA to strengthen the warnings associated with Roundup and by concealing information from Plaintiffs while knowing that Roundup was unsafe, dangerous, and did not conform to EPA regulations; and by improperly concealing and/or misrepresenting information from Plaintiffs, scientific and medical professionals, and/or the EPA concerning the severity of risks and dangers of Roundup from Plaintiffs, scientific and medical professionals, and the EPA compared to other forms of herbicides.

97.    Defendant under-reported, underestimated, and downplayed the serious dangers of Roundup.

98.    Defendant deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

99.    Even though Defendant knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendant continued to market, manufacture, distribute, and sell Roundup to consumers, including to Plaintiffs.

100.    Defendant knew or should have known that consumers like Plaintiffs would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care, as set forth above.

101.    Defendant's defective design of Roundup amounted to willful, wanton, and/or reckless conduct by Defendant.

102.    Defendant's actions and negligence were the proximate cause of Plaintiffs' injuries, harm, and economic loss, which Plaintiffs suffered and will continue to suffer.

103.    As a result of the foregoing acts and omissions, Plaintiff Yolanda Johnson suffered from serious and dangerous side effects including, but not limited to, NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Plaintiff suffered life-threatening NHL, and severe personal injuries, which are permanent and lasting, physical pain and mental anguish, including diminished enjoyment of life.

104.    WHEREFORE, Plaintiffs respectfully ask this Court to enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## SECOND CAUSE OF ACTION
## (STRICT PRODUCTS LIABILITY—DESIGN DEFECT)

105.    Plaintiffs repeat, reiterate and, re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth here.

106.    At all times mentioned herein, Defendant designed, researched, manufactured, tested, advertised, promoted, sold, distributed the Roundup product used by Plaintiffs. Defendant through that conduct has knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as Plaintiffs who are exposed to it through ordinary and reasonably foreseeable uses.

107.    Defendant's intended its Roundup product to reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in

which it was produced, manufactured, sold, distributed, and marketed by the Defendant. And the product did, in fact, reach Plaintiffs in the same manner.

108.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks far outweighed the benefits associated with the design or formulation of Roundup.

109.    The Roundup products designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant were defective in design and formulation in that, when it left the hands of the Defendant's manufacturer and/or supplier, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

110.    Defendant knew or should have known that, at all times here mentioned, Roundup was defective and was and is inherently dangerous and unsafe.

111.    Plaintiff Yolanda Johnson was exposed to Roundup, as described above, without knowledge of its dangerous characteristics.

112.    At the time of Plaintiff Yolanda Johnson's use of and exposure to Roundup, it was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

113.    Defendant, with this knowledge, designed its Roundup, with a dangerous condition for use by the public, and in particular Plaintiffs.

114.    Because of the foregoing, Defendant has become strictly liable to the Plaintiffs for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

115.    Defects in Defendant's Roundup were the cause or a substantial factor in causing Plaintiffs' injuries.

116.    As a result of the foregoing acts and omission, Plaintiff Yolanda Johnson developed NHL, and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

117.    WHEREFORE, Plaintiffs respectfully ask this Court to enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

### THIRD CAUSE OF ACTION
### (STRICT PRODUCTS LIABILITY—FAILURE TO WARN)

118.    Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth here.

119.    Defendant has engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct has knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as Plaintiffs who are exposed to it through ordinary and reasonably foreseeable uses.

120.    Defendant did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Plaintiffs. Defendant also intended and expected the Roundup it sold, distributed, supplied, manufactured, and promoted would (and, in fact, did) reach consumers, including Plaintiffs, without any substantial change in the condition of the product from when Defendant first distributed it.

121.    At the time of Roundup's manufacture, Defendant could have provided the warnings or instructions related to the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

122.    At all times mentioned here, that product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user and was so when it was distributed by Defendant and when Plaintiff Yolanda Johnson was exposed to the product. The defective condition of Roundup included the fact that it did not come with proper warnings about its carcinogenic qualities and possible side effects, including, but not limited to, developing NHL as a result of exposure and use.

123.    Roundup contained no warning or caution statement required to protect the health of those exposed to it. Defendant's failure to include such a warning or caution statement violated 7 U.S.C. § 136j(a)(1)(E).

124.    Defendant could have amended Roundup's label to provide more warnings.

125.    This defect caused serious injury to Plaintiff Yolanda Johnson, who used Roundup in its intended and foreseeable manner.

126.    At all times here mentioned, Defendant had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to ensure that the product did not cause users to suffer from unreasonable and dangerous side effects.

127.    Defendant labeled, distributed, and promoted the aforesaid product even though it was dangerous and unsafe for the use and purpose for which it was intended.

128.    Defendant was aware of the probable consequences of that conduct. Defendant knew or should have known that Roundup caused serious injuries. Despite this fact, Defendant failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup exposure, while these side effects were known or reasonably scientifically knowable at the time of distribution. Defendant acted with a conscious disregard for the safety of Plaintiffs by willfully and deliberately failing to avoid the consequences associated with their failure to warn.

129.    Defendant failed to warn of the nature and scope of the side effects associated with Roundup-- its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL. To date, Defendant continues to deny these facts and fails to adequately warn of the true risks of Plaintiffs' injuries associated with the use of and exposure to Roundup.

130.    At the time of exposure, Plaintiffs could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

131.    Defendant, as the manufacturer and/or distributor of the subject product, is held to the level of knowledge of an expert in the field.

132.    Plaintiffs reasonably relied on the skill, superior knowledge, and judgment of Defendant.

133.    Had Defendant properly disclosed the risks associated with Roundup, Plaintiff Yolanda Johnson would have avoided the risk of NHL by not using Roundup.

134.    The information that Defendant did provide or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiffs, and similarly situated individuals, to use the product safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading. It failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate. In fact, Defendant continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and it concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information, or research about the risks and dangers of exposure to Roundup and glyphosate.

135.    As a result of their inadequate warnings, Roundup was defective and unreasonably dangerous when it left the possession and/or control of Defendant, was distributed by Defendant, and used by Plaintiff.

136.    As a direct and proximate result of Defendant's actions as alleged here, and in such other ways to be later shown, the subject product caused Plaintiffs to sustain injuries here alleged.

137.    WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## FOURTH CAUSE OF ACTION
## (BREACH OF IMPLIED WARRANTIES)

138.    Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth here.

139.    At all times mentioned herein, Defendant manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup as a broad-spectrum herbicide. These actions were under the ultimate control and supervision of Defendant.

140.    When Defendant marketed, sold, and distributed Roundup for use by Plaintiff, Defendant knew of its intended use and impliedly warranted the product to be safe and fit for this use.

141.    Plaintiffs are the intended third-party beneficiaries of implied warranties made by Defendant to the purchasers of its horticultural herbicides, and as such Plaintiffs are entitled to assert this claim.

142.    The Defendant impliedly represented and warranted to Plaintiffs and users of Roundup, the agricultural community, and the general public that it was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

143.    Defendant intended that its Roundup products be used in the manner in which Plaintiff in fact used them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup was not adequately tested or researched.

144.    Defendant, however, failed to disclose that Roundup has dangerous propensities when used as intended and that the use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiffs' injuries.

145.    These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

146.    In reliance upon Defendant's implied warranty, Plaintiff Yolanda Johnson used Roundup as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Defendant.

147.    Plaintiffs could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

148.    Plaintiffs did rely on said implied warranty of merchantability of fitness for particular use and purpose.

149.    Plaintiffs reasonably relied on the skill and judgment of Defendant as to whether Roundup was of merchantable quality and safe and fit for its intended use.

150.    Roundup was injected into the stream of commerce by Defendant in a defective, unsafe, and inherently dangerous condition. Roundup's ingredients were expected to (and did) reach users, handlers, and persons coming into contact with it without substantial change in the condition in which it was sold.

151.    The Defendant breached the aforesaid implied warranties, as Roundup was not fit for its intended purpose and use.

152.    As a result of the foregoing acts and omissions, Plaintiff Yolanda Johnson suffered from NHL and suffered severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and non-economic damages.

153.    WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## FIFTH CAUSE OF ACTION
## (PLAINTIFF JOEL JOHNSON'S LOSS OF CONSORTIUM)

154.    Plaintiff Joel Johnson repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth here.

155.    At all relevant times alleged herein, the Plaintiffs were married and continue to be married.

156.    As a result of the wrongful and negligent acts of the Defendant in proximately causing Plaintiff Yolanda Johnson's injuries, including but not limited to NHL, Plaintiff Joel Johnson has been deprived of the services, society, companionship, and consortium of his wife and has been required to care for her and to expend funds for her medical care and treatment.

157.    As a direct and proximate result of the wrongful and negligent acts of the Defendant in proximately causing Plaintiff Yolanda Johnson's injuries, including but not limited to NHL, Plaintiff Joel Johnson has suffered and will continue to suffer in the future, loss of consortium, loss of support and services, loss of love, companionship, affection, society, sexual relations, and other damages allowed under the laws of Florida.

158.    As a direct and proximate result of the wrongful and negligent acts of the Defendant in proximately causing Plaintiff Yolanda Johnson's injuries, Plaintiff Joel Johnson seeks damages for recovery of his loss of consortium, loss of support and services, loss of love, companionship, affection, society, sexual relations, and other damages allowed under the laws of Florida.

## PRAYER FOR RELIEF

159.    WHEREFORE, Plaintiffs demand judgment against Defendant on each of the above-referenced claims and causes of action as follows:

a.    Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

b.    Awarding compensatory damages to Plaintiffs for past and future damages, including but not limited to, Plaintiffs' pain and suffering, and for severe and permanent personal injuries sustained by Plaintiffs, including health care costs and economic loss;

c.    Awarding economic damages in the form of medical expenses, out-of-pocket expenses, lost earnings, and other economic damages in an amount to be determined at trial of this action;

d.    Awarding damages to Joel Johnson for his loss of consortium, loss of support and services, loss of love, companionship, affection, society, sexual relations, and other damages.

d.    Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendant which demonstrated a complete disregard and

reckless indifference for the safety and welfare of the general public and to Plaintiff in an amount sufficient to punish Defendant and deter future similar conduct, to the extent allowed by applicable law;

e.      Pre-judgment interest;

f.      Post-judgment interest;

g.      Awarding Plaintiffs reasonable attorneys' fees;

h.      Awarding Plaintiffs the costs of these proceedings; and

i.      Such other and further relief as this Court deems just and proper.

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs hereby demand trial by jury as to all issues.


Dated:  April 16, 2025             HENDLER FLORES LAW PLLC

By:  */s/ Valerie S. Farwell*
      Valerie S. Farwell
      901 S. MoPac Expressway
      Bldg. 1, Suite #300
      Austin, Texas 78746
      Telephone: (512) 439-3200
      Facsimile: (512) 439-3201
      vfarwell@hendlerlaw.com
      ***ATTORNEY FOR PLAINTIFFS***